**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
THE EDWARD ANDREWS GROUP INC.,  :

     **Plaintiff,**   :

   -against-     :

ADDRESSING SERVICES COMPANY, INC., :

     **Defendant.**   :
-------------------------------------------------------------X

      07 Civ. 4607 (AJP)

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE

### PRELIMINARY STATEMENT

  Plaintiff The Edward Andrews Group Inc. ("EAG") submits this memorandum of law in opposition to the motion in limine (Motion") filed by Defendant Addressing Services Company, Inc. ("ASCO").

  ASCO's Motion constitutes an improper and groundless attempt to rewrite the Investment Banking Agreement to selectively excise one element of the "Consideration" used to determine the fee due to EAG. That element of Consideration is essential to calculate the fee due to EAG based on the full value of ASCO. ASCO also wants to have it both ways. ASCO wants to try to claim that certain amounts paid by ASCO to Michael Rittlinger ("Rittlinger") might in part have had some business purpose, but ASCO wants to hide from the trier of fact the true nature of those payments, e.g. to pay Rittlinger's home mortgage and home repairs, for loans to friends, payments to family members, etc.

  ASCO also seeks to limit the introduction of evidence concerning EAG's unjust enrichment claim to the time period after the date of the January 13, 2004 investment banking

agreement ("Investment Banking Agreement"). The unjust enrichment claim will only be considered if the Investment Banking Agreement is determined to be unenforceable. If that agreement is unenforceable, then the date of that null agreement can have no significance. EAG is entitled to present evidence of whatever relevant investment banking advisory services were rendered to ASCO, regardless of the date that they were rendered.

## STATEMENT OF FACTS

The Court is respectfully referred to the accompanying affidavit of Timothy E. Brog, sworn on March 19, 2008 ("Brog Affidavit"), for a statement of the facts relating to the instant Motion.

## ARGUMENT

### I

### ASCO CANNOT REWRITE
### THE INVESTMENT BANKING AGREEMENT

The Investment Banking Agreement defines the "Consideration" used to calculate EAG's 4% fee upon the occurrence of an Extraordinary Transaction, as follows:

> "The term 'Consideration' shall be deemed to include, but not limited to, (i) the amount of equity investment(s) in [ASCO], (ii) loans to [ASCO], (iii) proceeds received from the sale of assets of [ASCO], (iv) the assumption (whether through the sale of assets or securities) of all indebtedness (which includes capital leases), (v) proceeds received by the Shareholders of [ASCO] from the sale of securities, (vi) distributions, dividends and bonuses of any kind to Shareholders after the date of this Agreement, but only to the extent that the aggregate of all such distributions, dividends, dividends [sic] and bonuses exceed $200,000 and (vii) stock, cash, debt instruments, or anything of value received by [ASCO] or the Shareholders in any merger, consolidation or any Extraordinary Transaction."

2

Investment Banking Agreement, at ¶ 2.  The Investment Banking Agreement defines "Shareholder" as Michael Rittlinger ("Rittlinger").  Id., at first unnumbered paragraph.

ASCO is improperly attempting to rewrite the Investment Banking Agreement to excise subparagraph 2(vi), relating to distributions, dividends and bonuses of any kind received by Rittlinger after January 13, 2004, to the extent that they aggregate more than $200,000.  The Brog Affidavit details the fact that subparagraph 2(vi) is a necessary and critical term of the Investment Banking Agreement to ensure that EAG's fee is based on the full value of ASCO. Without that provision, ASCO could evade its obligation to pay a fee to EAG.  Rittlinger could, as actually happened, take substantial distributions, dividends and bonuses from ASCO which would reduce the cash and/or other assets of ASCO.  ASCO's value in an Extraordinary Transaction would then be reduced based on the diminished cash and/or asset position.

EAG would never have agreed to the Investment Banking Agreement if it did not include subparagraph 2(vi), since that provision offers fundamental protection that EAG's fee will be calculated based on the total fair value of ASCO (including present cash and other assets, and future profitability) rather than a value diminished by distributions unrelated to any proper business purpose.  See Brog Affidavit, at ¶ 9.

As detailed in the Brog Affidavit, Rittlinger took more than $1 million out of ASCO between January 13, 2004 and the date of the Extraordinary Transaction between ASCO and Blue Point Capital Partners ("Blue Point") in March 2007 ("Blue Point Transaction"). ASCO and Rittlinger represented to Blue Point that such payments should be considered "Add-Backs" for the purpose of determining ASCO's future profitability since the amounts taken by Rittlinger were not for any business purpose of ASCO and therefore would not recur in the future operations of ASCO.

By taking more than $1 million out of ASCO after the date of the Investment Banking Agreement, Rittlinger reduced the cash and/or other assets of ASCO by a commensurate amount as of the date of the Blue Point Transaction. The Investment Banking Agreement plainly provides that EAG's fee is to be calculated based on Consideration that includes all such monies taken out of ASCO by Rittlinger (to the extent that they aggregate more than $200,000). ASCO has failed to state any basis for selectively invalidating a portion of the Investment Banking Agreement that was indisputably agreed to by EAG and ASCO.

ASCO cites <u>Linkco, Inc. v. Fujitsu Ltd.</u>, 232 F.Supp.2d 182, 191 (S.D.N.Y. 2002), for the general proposition that irrelevant evidence may be excluded. <u>Linkco</u> found that "Fujitsu's projections would be admissible if they were created near the time of the hypothetical negotiation and if it were probable that the parties would have considered the figures during their negotiations." Since the projections were not available until several months after the hypothetical negotiations, the projections were not admissible. <u>Linkco</u> has no application whatsoever to the instant action.

ASCO also cites various cases for the unexceptional proposition that contracts are to be read as a whole. Contrary to the concept of reading a contract as a whole, ASCO argues that subparagraph 2(vi) of the Investment Banking Agreement should be excised. The Brog Affidavit details the purpose and intent of subparagraph 2(vi), which was to insure that the value of ASCO in any Extraordinary Transaction would not be diminished by distributions, dividends and bonuses of any kind (to the extent that they aggregated more than $200,000) since the date of the Investment Banking Agreement. ASCO has presented no evidence concerning the purpose and intent of subparagraph 2(vi).

4

ASCO requests that this Court apply the doctrine of <u>contra proferentem</u>. EAG believes that the provisions of the Investment Banking Agreement are not ambiguous. The doctrine of <u>contra proferentem</u> is a rule of construction for ambiguous provisions, and is applied only as a "last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless." <u>O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.</u>, 37 F.3d 55, 61 (2d Cir. 1994). Even when an agreement is ambiguous, "[w]here the relevant extrinsic evidence offered raises a question of credibility or presents a choice among reasonable inferences the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the contra proferentem rule." <u>Core-Mark Int'l Corp. v. Commonwealth Ins. Co.</u>, 2006 U.S.Dist LEXIS 61338, at *23 (S.D.N.Y. 2006) (Pauley D.J.) (numerous citations omitted) (copy attached hereto). Assuming, <u>arguendo</u>, that subparagraph 2(vi) of the Investment Banking Agreement is ambiguous, the extrinsic evidence offered in the Brog Affidavit creates a question of fact to be resolved at trial.

As detailed in the Brog Affidavit, ASCO is now trying to back-track from its prior representations to Blue Point and is claiming that some of the personal expenses of Rittlinger paid by ASCO might in part have had some business purpose. If ASCO admits that the "Add-Backs" and other personal expenses charged to ASCO constitute "Consideration" under the Investment Banking Agreement, EAG will have no need to introduce any evidence concerning the nature of those expenses. ASCO, however, has thus far refused to so stipulate. To the extent that ASCO attempts to claim that certain personal expenses may have had some business purpose, EAG should certainly be permitted to introduce evidence as to the nature of those expenses, such as the payment of Rittlinger's home mortgage and home repairs, etc. EAG should also be permitted to impeach Rittlinger if he takes a position at trial concerning the

5

expenses which is contrary to prior representations by Rittlinger. Similarly, in the absence of an admission or stipulation as to the personal expenses, EAG should be entitled to inquire as to the tax treatment of those expenses and whether or not the tax treatment is consistent with Rittlinger's position.

Finally, ASCO's counsel makes the accusation that EAG did not designate David Renouf, a non-party who was ASCO's former accountant, as a live witness and instead has chosen to designate Renouf's deposition testimony because "Renouf is in a position to dispel EAG's unsupported insinuation of improper tax treatment." ASCO memorandum of law, at pp. 6-7. EAG designated Renouf's deposition testimony because Renouf is a non-party who works in Connecticut. ASCO's counsel attended Renouf's deposition and declined to ask Renouf any questions. Renouf was asked in his deposition about the tax treatment of Rittlinger's personal expenses charged to ASCO. If ASCO's counsel believed that there was anything misleading about those questions or Renouf's answers, ASCO's counsel had the opportunity to examine Renouf and waived that opportunity.

ASCO has stated no basis for excising subparagraph 2(vi) from the Investment Banking Agreement and excluding from trial evidence relating to that element of Consideration.

## II

### THE TIME PERIOD FOR SERVICES RELATING TO EAG'S UNJUST ENRICHMENT CLAIM IS NOT LIMITED BY THE DATE OF THE INVESTMENT BANKING AGREEMENT

EAG's unjust enrichment claim is stated in the alternative to EAG's claim for breach of the Investment Banking Agreement. Only in the event that the Investment Banking Agreement is determined to be unenforceable will the trier of fact proceed to consider the unjust enrichment claim. ASCO, however, argues that the evidence presented in support of the unjust

enrichment claim can only relate to the period after the date of the Investment Banking Agreement. Assuming, arguendo, that the Investment Banking Agreement is unenforceable, the date of a null contract cannot govern the time period for evidence of services presented in support of an unjust enrichment claim.

ASCO cites Louissier v. Universal Music Group, Inc., 2005 U.S.Dist. LEXIS 45431, at *5 (S.D.N.Y. Aug. 30, 2005). That case held that knowledge of the copyright laws and intent to infringe are not elements of a claim for copyright infringement, and therefore evidence relating to those subjects was not relevant to the issue of liability for copyright infringement. That case has no application whatsoever to the instant action.

ASCO also cites certain deposition testimony by Brog in which he stated that he was not aware of any fees owed to EAG by ASCO during the period from May 2002 until January 2004. The Brog Affidavit states that EAG was due a fee for investment banking advisory services only upon the occurrence of an Extraordinary Transaction. Since there was no Extraordinary Transaction involving ASCO from May 2002 until January 2004, no such fee was due to EAG during that period. ASCO was not involved in an Extraordinary Transaction until in or about March 2007 when the Blue Point Transaction occurred.

The Brog Affidavit also states that EAG performed investment banking advisory services for ASCO from 1999 through mid-2004, and that those services benefited ASCO, as reflected in the terms of the Blue Point Transaction. EAG should be entitled to introduce evidence of all such services.

## CONCLUSION

For all of the reasons stated above and in the accompanying Brog Affidavit,

ASCO's Motion in limine should be denied in its entirety.

Dated: March 20, 2008

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.

By: _____
        David C. Burger (DB-8666)
1345 Avenue of the Americas
New York, New York 10105
(212) 603-6361
Attorneys for Plaintiff

8

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector | Dossier | History

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined
Terms: contra proferentem and date>1980 (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*2006 U.S. Dist. LEXIS 61338, \**

CORE-MARK INTERNATIONAL CORP., Plaintiff, -against- COMMONWEALTH INSURANCE CO.,Defendant.

05 Civ. 0183 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 61338

**August 30, 2006**, Decided

**PRIOR HISTORY:** Core-Mark Int'l Corp. v. Commonwealth Ins. Co., 2005 U.S. Dist. LEXIS 14312 (S.D.N.Y., July 19, 2005)

**CORE TERMS:** summary judgment, scheduled, coverage, declaratory judgment, stated value, ambiguous, extrinsic evidence, mutual mistake, purportedly, genuine, latest, contract claim, reformation, ambiguity, insured's, premium, blanket, insurance policy, material fact, blanket coverage, particularity, declaration, superfluous, proferentem, non-moving, non-movant, insurer, contra, deductible, warehouse

**COUNSEL:** [*1] Jill C. Owens, Esq. , David S. Douglas , Meiselman, Denlea, Packman, Carton & Eberz, P.C., White Plains, NY, Counsel for Plaintiff.

Costantino P. Suriano, Esq. , David W. Kenna, Esq. , Frederic R. Mindlin, Esq., Mound Cotton Wollan & Greengrass, New York, NY, Counsel for Defendant.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEYIII

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

Plaintiff Core-Mark International Corporation ("Core-Mark" or "Plaintiff") commenced this diversity action against Commonwealth Insurance Company ("Commonwealth" or "Defendant") alleging breach of an insurance contract and seeking a declaratory judgment of the parties' rights under the contract pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Defendant moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

*BACKGROUND*

Core-Mark is a consumer products supplier headquartered in California and Commonwealth is a Canadian insurance company. (Amended Complaint, dated May 27, 2005 PP5-6.) In the spring of [*2] 2002, Core-Mark retained Aon Risk Services of New York ("Aon"), an insurance broker, to purchase property insurance for each of Core-Mark's locations. (Plaintiff's Rule 56.1 Statement, dated Jan. 6, 2006 ("Pl. 56.1 Stmt.") P15.) Aon submitted an application to Commonwealth for excess insurance. (Pl. 56.1 Stmt. PP15-16.) The application included a schedule of values for the individual items to be insured at each Core-Mark location (the "Statement of Values"). (Pl. 56.1 Stmt. P15; Defendant's Rule 56.1 Statement, dated Dec. 5, 2005 ("Def. 56.1 Stmt.") PP8-9.) Among the locations Core-Mark sought to insure was a distribution warehouse in Aurora, Colorado (the "Aurora Facility"). (Def. 56.1 Stmt. P2.) The Statement of Values listed the following items for the Aurora Facility:

| | |
|---|---|
| Leasehold Improvements | $ 959,486 |
| Warehouse Equipment | $ 1,385,955 |
| Office Furniture/Fixtures | $ 117,827 |
| Tools, Dies, Jigs & Patterns | $ 10,000 |
| Stock/Inventory | $ 6,158,032 |

| | |
|---|---|
| Vehicles/Property in Yard | $ 727,909 |
| Accounts Receivable | $ 100,000 |
| Computer Equipment | $ 287,700 |
| Business Interruption | $ 4,140,605 |
| Extra Expense | $ 644,000 |
| TOTAL | $ 14,531,515 |

(Def. 56.1 Stmt. P9.) As set [*3] forth in the chart above, the aggregate value of the Aurora Facility's scheduled items was $ 14,531,514. The aggregate value of all properties inventoried in the Statement of Values, including the Aurora Facility, was approximately $ 308 million.

In June 2002, after Core-Mark had secured $ 10 million in primary insurance, Commonwealth issued an excess insurance policy of $ 10 million (the "Policy"). (Def. 56.1 Stmt. P1.) Commonwealth delivered the Policy to Aon at some point during the summer of 2002. (Affidavit of David S. Douglas, dated Jan. 5, 2006 ("Douglas Aff.") Ex. M.)

On June 5, 2002, Aon delivered to Core-Mark a binder titled "Confirmation of Coverage Bound" (the "Binder"). (Def. 56.1 Stmt. P6.) The Binder provides, *inter alia*, that coverage under the Policy is "subject to 'Occurrence Limit of Liability Endorsement' [the "OLLE"] with 10% margin clause to be attached to the policy." (Def. 56.1 Stmt. P7.) The OLLE, which was not attached to the Binder, states that "the premium for this policy is based upon the statement of values on file with the company." (Declaration of David W. Kenna, dated Dec. 5, 2005 ("Kenna Decl.") Ex. 3.) Paragraph 2 of the OLLE further provides: [*4]

In the event of loss hereunder, liability of the company . . . shall be limited to the least of the following:

a. The actual adjusted amount of loss, less applicable deduction(s) and/or underlyer(s).

b. The total stated value for the property involved, as shown on the latest statement of values on file with the company plus 10%, less applicable deductible(s) and/or underlyer(s).

c. The limit of liability or amount of insurance shown on the face of this policy or endorsement onto this policy.

(Kenna Decl. Ex. 3.) The "statement of values on file with the company" referenced in the OLLE is the Statement of Values.

On December 21, 2002, the Aurora Facility was burglarized and set afire. (Def. 56.1 Stmt. P10.) Core-Mark submitted an insurance claim for $ 19,294,939 in damages purportedly caused by the fire. (Def. 56.1 Stmt. P11.) Core-Mark obtained $ 10 million from its primary carriers, and sought the remaining $ 9,294,939 from Commonwealth as an excess carrier. (Def. 56.1 Stmt. P11.) Rather than pay this amount, Commonwealth accepted coverage only for certain items contained in the Statement of Values, and only for the amounts set forth therein. [*5] (Def. 56.1 Stmt. P12.) Purportedly in conformity with OLLE Paragraph 2(b)'s limitation of coverage to "the total stated value for the property involved, as shown on the latest statement of values on file with the company plus 10%," Commonwealth assessed the damage at the Aurora facility as follows:

| | Scheduled Values Plus 10% Per S.O.V. | Amount Paid By Commonwealth |
|---|---|---|
| Leasehold Improvements | $ 1,055,434.60 | $ 1,055,434.60 |
| Warehouse Equipment | $ 1,524,550.50 | $ 1,524,550.50 |
| Office Furniture/Fixtures | $ 129,609.70 | $ 1,29,609.70 |
| Tools, Dies, Jigs & Patterns | $ 11,000 | "no claim submitted" |
| Stock/Inventory | $ 6,773,835.20 | $ 6,773,835.20 |
| Vehicles/Property in Yard | $ 800,699.90 | "no coverage existed" |
| Accounts Receivable | $ 110,000 | "no claim submitted" |
| Computer Equipment | $ 316,470 | $ 316,470 |
| Business Interruption | $ 4,544,655.50 | $ 2,582,466 |
| Extra Expenses | $ 708,400 | $ 708,400 |
| Deductible | | ($25,000) |
| TOTAL | $15,984,665.40 | $ 13,065,777 |

(Def. 56.1 Stmt. P14.) Based on this analysis, Commonwealth paid Core-Mark $ 3,065,777 ($ 13,065,777 less the $ 10,000,000 paid by the primary carriers), leaving $ 6,229,162 of CoreMark 's $ 9,294,939 claim unpaid.

[*6] Core-Mark initially filed this action against Commonwealth in New York State Supreme Court in Westchester County to recover the $ 6,229,162 unpaid balance of its insurance claim. On January 7, 2005, Commonwealth removed the action to the Southern District of New York. The Complaint alleged breach of contract and bad faith refusal to pay, and sought a declaration of the parties' rights under the Policy.

On April 7, 2005, Commonwealth moved to dismiss Core-Mark's claim of bad faith refusal to pay. On May 31, 2005, Core-Mark amended the Complaint to assert claims against Swett & Crawford ("Swett"), an affiliate of Aon. By Order dated July 19, 2005, this Court granted the motion to dismiss the bad faith refusal claim against Commonwealth. *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, 2005 U.S. Dist. LEXIS 14312, No. 05 Civ. 183 (WHP), 2005 WL 1676704, at *3-4 (S.D.N.Y. Jul. 19, 2005). The Court also dismissed all claims against Swett, finding that Core-Mark named Swett as a defendant solely to defeat diversity jurisdiction. *Core-Mark Int'l Corp.*, 2005 U.S. Dist. LEXIS 14312, 2005 WL 1676704, at *2.

Commonwealth now moves for summary judgment dismissing Core-Mark's breach of contract claim, contending that **[*7]** OLLE Paragraph 2(b) caps its exposure at $ 3,065,777. Commonwealth further contends that Core-Mark's declaratory judgment claim is superfluous with the breach of contract claim, and therefore should be dismissed. Also, in responding to Commonwealth's motion, Core-Mark argues that mutual mistake necessitates a reformation of the Policy to reflect the intent of the parties. (Plaintiff's Memorandum in Opposition to Motion for Summary Judgment, dated Jan. 6, 2006 ("Pl. Opp. Mem.") at 15.) Commonwealth counters that the Amended Complaint fails to adequately plead a cause of action for mutual mistake.

*DISCUSSION*

I. *Summary Judgment Standard*

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The materiality **[*8]** of disputed facts is determined by the governing substantive law. *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). Material facts are those that "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 314 (2d Cir. 2001). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997). In determining whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255.

If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c) **[*9]** ; *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Liberty Lobby*, 477 U.S. at 248. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Liberty Lobby*, 477 U.S. at 252. Where it is apparent that no rational finder of fact "could find in favor of the non-moving parties because the evidence to support [their] case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir. 1994).

II. *Breach of Contract*

Under New York law, [1] "[i]t is well established . . . that a policyholder **[*10]** bears the burden of showing that the insurance contract covers" the policyholder's loss. *Morgan Stanley Group, Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). The initial interpretation of an insurance contract is a question of law for the Court. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). In performing this function, the Court must determine whether the particular provision at issue is ambiguous. *See Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994); *Reefer & Gen. Shipping Co. v. Great White Fleet, Ltd.*, 922 F. Supp. 935, 940 (S.D.N.Y. 1996). Whether contract language is ambiguous is a question of law properly resolved on a motion for summary judgment. *See, e.g., Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *see also Berman v. Parco*, 986 F. Supp. 195, 208-09 (S.D.N.Y. 1997); *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 810-11 (S.D.N.Y. 1994); *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990). **[*11]**

FOOTNOTES

1 This Court has previously determined that New York law applies to this action. *Core-Mark Int'l Corp.*, 2005 U.S. Dist. LEXIS 14312, 2005 WL 1676704, at *3.

Contract language is unambiguous if it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978)). Clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations. *See, e.g., Seiden Assoc.*, 959 F.2d at 428; *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Where no ambiguity exists, the plain language of the contract is the best evidence of the parties' intent, and there is no need to look beyond

the "four corners" of the agreement. Parol evidence of the parties' intentions is inadmissible. *See Seiden Assoc.*, 959 F.2d at 428; **[*12]** *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990).

Conversely, a contract is ambiguous if it is susceptible to more than one meaning. "An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987). "Once a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Morgan Stanley Group, Inc.*, 225 F.3d at 275-76 (internal quotations omitted).

### A. Ambiguity in the Policy

The parties agree that the present motion turns on the appropriate interpretation of OLLE Paragraph 2(b) which, as applied here, is the OLLE's most restrictive limitation on coverage. Paragraph 2(b) limits Commonwealth's exposure to: "[t]he total stated value **[*13]** for the property involved, as shown on the latest statement of values on file with the company plus 10%, less applicable deductible(s) and/or underlyer(s)." ²

---

**FOOTNOTES**

² Core-Mark contends that it was not provided a copy of the Policy until early 2003, and was therefore unaware of the OLLE when the fire occurred at the Aurora Facility. (Pl. 56.1 Stmt. 3.) Yet Commonwealth provided Aon, Core-Mark's broker, with a copy of the Policy before the date of the fire. Because New York law imputes the knowledge of an insurance broker to the insured, Core-Mark had constructive knowledge of the OLLE well in advance of the fire. *See Ribacoff v. Chubb Group of Ins. Cos.*, 2 A.D.3d 153, 154-55, 770 N.Y.S.2d 1, 2 (1st Dep't 2003).

---

### 1. Commonwealth's Interpretation

According to Commonwealth, Paragraph 2(b) unambiguously caps the insurer's liability at $ 3,065,777. Because Paragraph 2(b) limits liability to the "property involved," CoreMark 's recovery is purportedly confined to the scheduled items actually damaged **[*14]** in the Aurora Facility fire. Commonwealth contends that the amount of recovery is further limited to the stated value of these damaged items "as shown on the . . . statement of values . . . plus 10%." This interpretation of Paragraph 2(b) as a "scheduled" policy holds that "each separately treated item of property is in effect covered by a separate contract of insurance and the amount recoverable with respect to a loss affecting such property is determined independently of the other items of property." 12 Couch on Ins. § 175.90. ³

---

**FOOTNOTES**

³ A scheduled policy may be contrasted with a "blanket" policy, which "attaches to, and covers to its full amount, every item of property described in it." 12 Couch on Ins. § 177.72. Thus, pursuant to a blanket policy, "if the loss upon one item exhausts the full amount of the policy, the whole insurance must be paid . . ." 12 Couch on Ins. § 177.72.

---

Commonwealth asserts that Core-Mark's total recovery cannot exceed $ 15,984,665.40 (or $ 5,984,665.40 after the $ 10 million in primary **[*15]** insurance has been paid). This number represents the $ 14,531,514 worth of items listed on the Statement of Values for the Aurora Facility, plus 10%. Although the Aurora Facility purportedly suffered more than $ 15,984,665.40 in damages, Commonwealth did not pay the entire $ 5,984,665.40 over the primary insurance. This is because Commonwealth required Core-Mark to submit a claim for each item on the Statement of Values that was damaged in the fire.

Based on Core-Mark's submissions, Commonwealth has paid the full amount listed on the Statement of Values for the following items: Leasehold Improvements, Warehouse Equipment, Office Furniture/Fixtures, Stock/Inventory, Computer Equipment and Extra Expense. (Def. 56.1 Stmt. P12.) Commonwealth has not paid the amounts listed in the Statement of Values for Tools and Dies, Accounts Receivable and Vehicles and Properties because Core-Mark purportedly failed to submit a claim for these items. Further, Commonwealth has credited Core-Mark with only $ 2,582,466 of the $ 4,554,665.50 indicated for Business Interruption. Commonwealth contends that Core-Mark provided informal estimates of Business Interruption instead of a formal claim, and that **[*16]** these estimates were used by Commonwealth to calculate the $ 2,582,466 figure. ⁴ The total paid by Commonwealth, after deductibles and underlyers, is $ 3,065,777.

---

**FOOTNOTES**

⁴ Core-Mark disputes this assertion, having purportedly claimed at least $ 4,393,264.40 in Business Interruption losses. (*See* Pl. 56.1 Stmt. P21.)

---

### 2. Core-Mark's Interpretation

Core-Mark responds with several alternative constructions of Paragraph 2(b). First, Core-Mark argues that the "total stated value for the property involved" refers to every Core-Mark property covered by Policy, not just the Aurora Facility. According to Core-Mark, the value of these properties "as shown on the latest statement of values" equals $ 308 million, the total scheduled value for all Core-Mark properties. Because Commonwealth's liability cannot exceed the Policy limit, Core-Mark's interpretation would limit liability to $ 10 million under Paragraph 2(b).

This is not a tenable interpretation of Paragraph 2. Paragraph 2 limits Commonwealth's liability to [*17] the least of the following: (a) the actual adjusted amount of loss; (b) the "total stated value for the property involved, as shown on the latest statement of values" plus 10%; and (c) the "limit of liability or amount of insurance shown on the face of this policy." The recovery limit for 2(c) is $ 10 million, the total amount of the Policy. (Def. 56.1 Stmt. 1; Kenna Decl. Ex. 1.) Core-Mark's interpretation of 2(b) therefore yields the same coverage limit as 2(c), rendering one of these provisions superfluous. Under New York law, an insurance policy may not be read in a way that would render a provision "mere surplusage." *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 339, 740 N.E.2d 220, 717 N.Y.S.2d 75 (2000); *Bretton v. Mut. of Omaha Ins. Co.*, 66 N.Y.2d 1020, 1022, 489 N.E.2d 1299, 499 N.Y.S.2d 397 (1985). Core-Mark has failed to carry its burden to show that Paragraph 2(b) provides the full $ 10 million in coverage for the fire at the Aurora Facility. *Morgan Stanley Group Inc.*, 225 F.3d at 276.

However, Core-Mark's second interpretation of Paragraph 2(b) gives rise to a legitimate ambiguity. Under this interpretation, Core-Mark agrees with Commonwealth that the "property involved" refers [*18] only to the Aurora Facility and, therefore, the "total stated value for the property involved, as shown on the latest statement of values . . . plus 10%" limits Commonwealth's liability to $ 5,984,665.40. Core-Mark nevertheless contends that the quoted language provides for blanket coverage instead of scheduled coverage. For any particular item that was damaged at the Aurora Facility, Core-Mark disputes that recovery should be limited to the value of the item indicated on the Statement of Values. This is because, *inter alia*, the Statement of Values might have undervalued the item, the item's value might have increased after the Statement of Values was submitted to Commonwealth, or the item might be excluded from the Statement of Values altogether. ⁵ Thus, assume a building at the Aurora Facility suffered $ 7 million in actual damage during the fire. Further assume that the Statement of Values lists the building as worth only $ 5 million. Under the interpretation of Paragraph 2(b) advanced by Commonwealth, Core-Mark may recover only $ 5 million for damage to the building. Core-mark's interpretation of Paragraph 2(b) would allow a recovery of $ 5,984,665.40 million.

### FOOTNOTES

⁵ Core-Mark does not explain why the actual loss at the Aurora Facility purportedly exceeded $ 14,531,514.

[*19] Core-Mark argues that it submitted the Statement of Values to facilitate the calculation of a premium, not to establish a scheduled policy. (Pl. 56.1 Stmt. 8-9.) The caselaw is consistent with Core-Mark's contention. *See, e.g., Reliance Ins. Co. v. Orleans Parish Sch. Bd.*, 322 F.2d 803, 807 (5th Cir. 1963) (characterizing policy as blanket because plaintiff had submitted a statement of values to establish the premium). Indeed, OLLE Paragraph 2 begins with the proviso: "The premium for this policy is based upon the statement of values on file with the company."

Defendant cites two federal decisions to support its position: *Reliance Nat'l Indem. Co. v. Lexington Ins. Co.*, 2002 U.S. Dist. LEXIS 20629, No. 01 Civ. 3369, 2002 WL 31409576 (N.D. Ill. Oct. 23, 2002) and Judge McAvoy's unpublished order in *Knowlton v. Specialty Papers, Inc. v. Royal Surplus Lines Ins. Co.*, No. 03 Civ. 705 (N.D.N.Y. Oct. 14, 2003). At issue in *Reliance* was a property insurance policy with loss-limiting language similar to the OLLE. Because the policy included a statement of values, the court held it was "a scheduled policy with specific limits for particular items, not a blanket coverage policy. [*20] " *Reliance Nat'l Indem. Co.*, 2002 U.S. Dist. LEXIS 20629, 2002 WL 31409576, at *8. However, a more recent decision of that court has found the same loss-limiting language to be ambiguous as to whether scheduled or blanket coverage is provided. *See Berkshire Refrigerated Warehousing LLC v. Commercial Underwriters Ins. Co.*, 2006 U.S. Dist. LEXIS 19602, No. 05 Civ. 1953, 2006 WL 862877, at *2 (N.D. Ill. Mar. 27, 2006) ("The Court cannot say that the 'total stated value of the property involved' clearly or unambiguously refers to the category-bycategory figures listed in each box or cell of the Statement of Values chart . . ."). This inconsistency in the caselaw "lends some credence to the proposition that the language is ambiguous . . ." 2 Couch on Ins. § 22.15.

Further, *Knowlton* is inapposite because the policy at issue there unambiguously established scheduled coverage. That policy limited the insurer's liability to "one hundred percent of the individually stated value of each scheduled item of property insured as shown on . . . the statement of values." *Knowlton*, at 4. Here, the OLLE limits losses to the "total stated values" of the properties involved, rather than to "one hundred percent of the [*21] individually stated values."

Core-Mark has therefore identified an ambiguity as to whether Paragraph 2(b) limits coverage to $ 5,984,665.40 on a blanket or a scheduled basis. ⁶

### FOOTNOTES

⁶ Another possible interpretation of Paragraph 2(b), which was referenced but not discussed in Plaintiff's brief, would provide blanket coverage but add the 10% margin only to the portion of the loss falling within Commonwealth's excess layer of coverage. Thus, instead of applying the 10% to the entire $ 14,531,514 in stated values, the margin would be applied only to the $ 4,531,514 for which Commonwealth is responsible. That would cap Commonwealth's liability on a blanket basis at $ 4,973,676 instead of $ 5,984,665.40.

B. *Extrinsic Evidence*

If a provision of an insurance policy is ambiguous, the court may examine extrinsic evidence to determine the intent of the parties. *See Morgan Stanley Group, Inc.*, 225 F.3d at 275-76; *Hit Factory, Inc. v. Royal Ins. Co. of Am.*, 2005 U.S. Dist. LEXIS 19050, No. 02 Civ. 4068 (DAB), 2005 WL 2125803, **[*22]** at *3 (S.D.N.Y. Aug. 26, 2005). When the court turns to the extrinsic evidence, "the burden shifts to the insurer to provide that its interpretation [of the policy] is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage; in the absence of extrinsic evidence, the burden shifts at the summary judgment stage." *Morgan Stanley Group Inc.*, 225 F.3d at 276 (internal citations omitted). "Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the **contra proferentem** rule of contract construction." *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 36 F. Supp. 2d 605, 609 (S.D.N.Y. 1999) (citing *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir. 1994)); *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671, 486 N.E.2d 827, 495 N.Y.S.2d 969 (1985). Under the **contra proferentem** rule, a "policy must . . . be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." *Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) (quoting *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232, 492 N.E.2d 1206, 501 N.Y.S.2d 790 (1986)). **[*23]**

However, where "each party has submitted extrinsic evidence to support its interpretation of the [i]nsurance [c]ontract," the parties "creat[e] an issue of fact that precludes application of **contra proferentem** at the summary judgment stage." *E. Air Lines, Inc. v. Ins. Co. of the State of Penn.*, 2001 U.S. Dist. LEXIS 14734, No. 96 Civ. 7113 (MGC), 2001 WL 1111514, at *5 (S.D.N.Y. Sept. 21, 2001); *see also Morgan Stanley Group, Inc.*, 36 F. Supp. 2d at 609 ("[W]here the relevant extrinsic evidence offered 'raises a question of credibility or presents a choice among reasonable inferences' the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the **contra proferentem** rule." (quoting *Alfin, Inc. v. Pac. Ins. Co.*, 735 F. Supp. 115, 119 (S.D.N.Y. 1990)).

Here, the extrinsic evidence proffered by Commonwealth does not establish as a matter of law that the Policy is scheduled. Commonwealth relies on the testimony of Barbara Groves, one of Commonwealth's underwriters. (Transcript of Proceedings, dated Feb. 3, 2006, at 6.) Groves testified that Paragraph 2(b) requires an item-by-item assessment of the Aurora **[*24]** Facility's damages. (Douglas Aff. Ex G: Groves Deposition Transcript, at 34-37, 51-53.).

Core-Mark counters with a variety of evidence favoring its interpretation of the Policy. The application for insurance that Core-Mark submitted to Commonwealth, for example, stated that "this is not a scheduled policy." (Douglas Aff. Ex. I at CMM 00757.) Likewise, an August 2002 email from Aon to Virginia Murray, another of Commonwealth's underwriters, states, "The premium should be based on the [statement of] values, being that this is not a scheduled policy." (Douglas Aff. Ex. M.) Murray wrote "OK" in response to Aon's email. (Douglas Aff. Ex. M.) The available extrinsic evidence, viewed in a light most favorable to Plaintiff, does not support Defendant's interpretation of the OLLE. Therefore, "there is a genuine issue of fact as to the interpretation of the [i]nsurance [c]ontract that must be resolved at trial." *E. Air Lines, 2001 U.S. Dist. LEXIS 14734, 2001 WL 1111514*, at *6.

III. *Mutual Mistake*

In responding to Defendant's motion for summary judgment, Core-Mark asserts that mutual mistake prevented the Policy from reflecting the true intent of the parties. (Pl. Opp. Mem. at 15.) Core-Mark **[*25]** requests a reformation in accord with the parties' purported intent. (Pl. Opp. Mem. at 15.) Pursuant to Fed. R. Civ. P. 9(b), "in all averments of . . . mistake, the circumstances constituting . . . mistake shall be stated with particularity." The primary purpose of Rule 9 (b)'s heightened pleading requirements is to "afford defendant[s] fair notice of the plaintiff's claim and the factual ground upon which it is based." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990). Further, New York law establishes a "heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986). To establish mutual mistake, a party must offer "clear, positive and convincing evidence," *Amend v. Hurley*, 293 N.Y. 587, 595, 59 N.E.2d 416 (1944), and "show in no uncertain terms, not only that mistake . . . exists, but exactly what was really agreed upon between the parties," *Loewenson v. London Mkt. Cos.*, 351 F.3d 58, 61 (2d Cir. 2003) **[*26]** (quoting *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219, 385 N.E.2d 1062, 413 N.Y.S.2d 135 (1978)).

Here, the Amended Complaint fails to plead mutual mistake at all, let alone with the particularity required by Rule 9(b). The deadline for amending the pleadings was May 31, 2005, and discovery ended on October 14, 2005. Yet Core-Mark failed to request a reformation until the filing of its summary judgment opposition brief on January 6, 2006. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (holding that plaintiff may not amend his complaint through argument in a brief opposing summary judgment). Core-Mark has not requested permission to further amend its complaint. Indeed, any further amendments would be inappropriate given the advanced procedural stage of this litigation. *See Ansam Assocs. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) ("[A] proposed amendment [is] especially prejudicial . . . [when] discovery ha[s] already been completed and [the non-movant] ha[s] already filed a motion for summary judgment.").

Because Plaintiff has failed to plead mistake with particularity as required by Rule 9(b), Defendant's **[*27]** summary judgment motion is granted with respect to Plaintiff's request for reformation. *See Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 248 (S.D.N.Y. 2006) (dismissing claims for failure to plead mutual mistake with particularity).

IV. *Declaratory Judgment*

Plaintiff seeks a declaration of the parties' rights under the Policy. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). While district courts typically have a "virtually unflagging obligation" to exercise their jurisdiction, _Colo. River Water Conservation Dist. v. United States_, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976), they "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfied subject matter jurisdictional prerequisites." _Wilton v. Seven Falls Co._, 515 U.S. 277, 282, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995). In order to decide whether to entertain an action for [*28] declaratory judgment, this Court must ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. _Duane Reade, Inc._, 411 F.3d at 389; _Texport Oil Co. v. M/V. Amolyntos_, 11 F.3d 361, 366 (2d Cir. 1993).

Here, the declaratory relief sought by Core-Mark would serve no useful purpose. Because this Court has already analyzed the parties' rights under the Policy in connection with the breach of contract claim, a declaratory judgment on the same issue would be superfluous. Commonwealth's motion for summary judgment is therefore granted with respect to Core-Mark 's declaratory judgment claim. _See, e.g._, _Bristol-Myers Squibb Co. v. Int'l Bus. Ins. Co._, 354 F. Supp. 2d 499, 506 (S.D.N.Y. 2005) ("[T]he issue of arbitrability has been determined in the context of passing on SRI's motion to compel arbitration. [Plaintiff's claim for] a declaratory judgment on that point [] therefore is unnecessary."); _Park S. Tenants Corp. v. 200 Cent. Park S. Assoc._, 754 F. Supp. 352, 355 (S.D.N.Y. 1991) [*29] (dismissing declaratory judgment claims which were "superfluous" with other claims).

CONCLUSION For the foregoing reasons, Commonwealth's motion for summary judgment is granted dismissing Core-Mark's breach of contract claim insofar as Core-Mark seeks compensatory damages exceeding $ 2,918,888.40 (the difference between the $ 5,984,665.40 limitation on liability and the $ 3,065,777 Commonwealth has already paid), excluding interest and costs. Otherwise, summary judgment on the breach of contract claim is denied. Commonwealth's motion for summary judgment is granted dismissing Core-Mark's claims for reformation and a declaratory judgment.

Dated: August 30, 2006

New York, NY

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

Source: Legal > Cases - U.S. > District & State Courts - By State > NY Federal District & State Courts, Combined
Terms: contra proferentem and date>1980  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Wednesday, March 19, 2008 - 2:28 PM EDT
* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any Shepard's signal to Shepardize® that case.

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

LexisNexis®  About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.