# EXHIBIT A

21

M. Rittlinger

A.    Okay.

Q.    Is that a copy of the consulting agreement that we've been talking about?

A.    It is, yeah.

Q.    Okay.  And your signature appears on page 3?

A.    Yeah, that's mine.

Q.    And just for the record, the consulting agreement is dated January 13, 2004. Do you see that?

A.    Right, I do.

Q.    Okay.  As of January 2004, did you have any intention one way or the other as to using the Edward Andrews Group with respect to any future transaction involving ASCO?

MR. FISHER:  Objection as to form.

A.    As of January '04?

Q.    Correct.

A.    I did.

Q.    And what was your intention at that time?

A.    That Tim would have represented ASCO on the seller's side, this time trying to, you know, sell -- sell my company.

22

                         M. Rittlinger

1

2        Q.    And for how long did that remain your

3  intention?

4        A.    Probably five or six months.

5        Q.    And was there something that happened

6  five or six months after January 2004 that caused

7  your intention to change?

8        A.    Yes.

9        Q.    What was that?

10        A.    Well, our business venture here went

11  awry, as we all know, and I couldn't make

12  payments to Tim because I was losing, you know,

13  $50,000 a month minimum, and as the payments

14  stopped, he sued me.

15        Q.    Was it the service of the lawsuit on

16  you that changed your intention?

17        A.    That was certainly a big part of it.

18        Q.    And do you recall what constituted any

19  other part of the change in intention other than

20  the service of the lawsuit upon you?

21        A.    Well, lawsuit, the venture that I got

22  into was truly, truly, truly the worst venture

23  that I ever got into at ASCO, the worst one.  To

24  this day, it's still a loser and, you know,

25  it's -- it just wasn't -- it just wasn't a good

M. Rittlinger                    45

1   last page of that agreement?

2       A.    Yeah, it does.

3       MR. FISHER:  Mr. Burger, would this be

4   an okay time for a break?

5       MR. BURGER:  Not in the middle of a

6   document.

7       MR. FISHER:  I extended Mr. Brog the

8   courtesy of breaking when there wasn't a

9   question pending.

10      MR. BURGER:  We just --

11      MR. FISHER:  And I'm happy to

12  represent to you that I will not discuss

13  with Mr. Rittlinger anything about the

14  exhibit you're about to question him about.

15      MR. BURGER:  We will take the break in

16  just a few moments.

17      Q.    What was your understanding of that

18  agreement?

19      A.    That Tim upon, you know, signing this

20  agreement, that Tim would represent ASCO, you

    know, on the seller's side, that he would, you

    know, bring -- bring deals to the table and

    consult with me and provide, you know, quality

    services, you know, for his fee.

46

M. Rittlinger

1

2    Q.    I believe you testified earlier today

3    that it was your intention to use Tim to

4    represent ASCO on the seller's side, at least up

5    until the time that you received the complaint in

6    the first lawsuit, is that correct?

7    A.    That's correct.

8    Q.    And was it your intention to utilize

9    Tim in that capacity under the terms of that

10    agreement, Brog 15, with respect to any such sale

11    of ASCO?

12    MR. FISHER:    Objection as to form.

13    A.    I would have used Tim, yes, if things

14    didn't get so soured.

15    Q.    By the way, the Klein transaction

16    ended up in the lawsuit?

17    A.    That's -- that's a big part of it.

18    Q.    What is any other part of it?

19    A.    Well, the fact that he, you know, got

20    me into, you know, the First Party billing, you

21    know, looking -- looking for payment for really,

22    you know, having, you know, one or two meetings

23    with us.  It was-- it just wasn't right.

24    I mean, the money that was given, the

25    lawsuit that was presented, the continued, you